IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

HERMAN MARTIN BAILEY,

          Petitioner,

v.                                    Case No. 6:05-cv-00249

THOMAS MCBRIDE, Warden,
Mount Olive Correctional Complex,

          Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending are Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (docket sheet document # 1) and Respondent's Motion to Dismiss and Motion for Summary Judgment (# 12).  This matter was referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

Petitioner filed the instant section 2254 petition on March 25, 2005. (# 1).  By order entered March 31, 2005, the undersigned directed Respondent to answer the petition.  (# 5).  On April 29, 2005, Respondent filed a Motion to Dismiss the petition on the grounds that Petitioner had failed to exhaust available state court remedies, as required by 28 U.S.C. § 2254(b), concerning Ground One of his section 2254 petition.  (# 7).

On May 10, 2005, the undersigned entered a Notice and Order advising Petitioner of his right to respond to the Motion to Dismiss and setting a deadline for the response and reply briefs. (# 8).  On May 25, 2005, Petitioner filed a "Reply" (# 9), in which he agreed to withdraw Ground One of his petition, thereby mooting Respondent's Motion to Dismiss.

On October 31, 2005, the undersigned submitted a Proposed Findings and Recommendation ("PF&R") proposing that the presiding District Judge find that Petitioner had exhausted Grounds Two through Seven of his petition and recommending that, in light of Petitioner's withdrawal of Ground One, the presiding District Judge deny as moot Respondent's Motion to Dismiss.  (# 10).[1]  By separate order, the undersigned ordered Respondent to file a response addressing the merits of the exhausted claims.  (# 11).

On November 30, 2005, Respondent filed a Consolidated Answer, Motion to Dismiss and Motion for Summary Judgment (# 12) concerning Grounds Two through Seven of Petitioner's section 2254 petition, and exhibits in support thereof (# 13).  On November 30, 2005, the undersigned entered a Notice and Order, pursuant to the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising

---

[1]  On December 6, 2005, the presiding District Judge entered a Memorandum Opinion and Order adopting the undersigned's PF&R concerning the Respondent's first Motion to Dismiss, which found that Petitioner had exhausted Grounds Two through Seven of his section 2254 petition.  (# 16).  In light of this ruling, the undersigned will not repeat the procedural history concerning Petitioner's direct appeal or state habeas proceedings.

Petitioner of his right to respond to Respondent's motions and setting deadlines for the response and a reply brief. (# 14).  An Amended Notice and Order was entered on December 12, 2005, after Petitioner was granted an extension of time to respond. (# 17).

On March 3, 2006, Petitioner filed a response in opposition to Respondent's motions (# 18).  The response also addressed new claims of ineffective assistance of counsel that had not been raised in Petitioner's initial section 2254 petition or in his state court habeas proceedings.  Respondent filed a reply brief on April 6, 2006.  (# 19).  On April 28, 2006, without seeking leave of the court, Petitioner filed a sur-reply. (# 20).  The matter is now ripe for determination.

## PETITIONER'S CLAIMS FOR RELIEF

The following grounds for relief contained in Petitioner's federal petition have been exhausted for purposes of review under section 2254:

A. Ground Two:     Petitioner was denied effective assistance of counsel prior to and during trial.

B. Ground Three:   The trial court erred by denying Petitioner a judgment of acquittal on the grounds of insufficiency of the evidence.

C. Ground Four:    Petitioner's sentence violates proportionality principles.

D. Ground Five:    The trial court's imposition of consecutive sentences was an abuse of discretion, was plain error, and denied Petitioner a fair trial.

E.   Ground Six:   Petitioner was denied a fair trial based upon the admission of unfairly prejudicial evidence.

F.   Ground Seven:   Petitioner was denied a fair trial based upon the exclusion of evidence under the West Virginia rape shield law.

(# 1).

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the United States Supreme Court held that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of

4

materially indistinguishable facts.  The Court went on to note that
under the "unreasonable application" test, a federal habeas court
may grant a writ of habeas corpus with respect to a claim
adjudicated on the merits in state court only if the state court
identifies the correct governing principle from the Supreme Court's
decision, but unreasonably applies that principle to the facts of
the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state
court's factual findings are correct:

> In a proceeding instituted by an application for a writ
> of habeas corpus by a person in custody pursuant to the
> judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be
> correct.   The applicant shall have the burden of
> rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254(e)(1).

Petitioner's claims were summarily refused by the Supreme
Court of Appeals of West Virginia with no specific ruling provided
as to those issues.  The United States Court of Appeals for the
Fourth Circuit has determined that "the phrase 'adjudication on the
merits' in § 2254(d) excludes only claims that were not raised in
state court, and not claims that were decided in state court,
albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475
(4th Cir. 2000).  When a state court summarily rejects a claim
without setting forth its reasoning, the federal court reviews the
record and the clearly-established Supreme Court law, but still
"confine[s] [its] review to whether the court's determination

5

'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." <u>Bell v. Jarvis</u>, 236 F.3d 149, 158 (4th Cir. 2000).

## FACTUAL BACKGROUND AND TESTIMONY

Petitioner was charged in the Circuit Court of Wood County with one count of first-degree sexual assault, five counts of sexual abuse by a parent, guardian, custodian or person in a position of trust to a child, and four counts of first-degree sexual abuse. Petitioner was convicted on all of these counts following a jury trial on June 15-16, 1998. (# 7, Ex. 2).

Petitioner's convictions arose out of complaints of sexual assault and sexual abuse by his two grand-nieces, "J.E.C." and "M.A.C," who periodically stayed at Petitioner's house. Petitioner was charged with watching the two girls while his wife was at work. A summary of the trial testimony follows:

J.E.C., who was twelve years old at the time of the trial, testified that, in the summer of 1996, she told her mother that she "felt uncomfortable" going to Petitioner's house because "he was touching me in my private areas." (# 13, Ex. 9 at 27). J.E.C. stated that, on a couple of occasions when Petitioner's wife was not home, Petitioner carried her to a bedroom where he would lay on top of her, with her clothes on, and move up and down on her. (<u>Id.</u> at 27-31). J.E.C. further testified that, during the summer of 1995, while she was staying at Petitioner's house, Petitioner

6

forced her to perform oral sex on him until she vomited.  (Id. at
29-30).  J.E.C. denied that anyone else had touched her in an
inappropriate manner.  (Id. at 32).

M.A.C., who was eleven at the time of the trial, testified
that, in July of 1996, she and her sister told their mother about
things that had happened at Petitioner's house when Petitioner's
wife, Barbara, was not home.  M.A.C. testified that Petitioner had
touched her "private parts and [her] butt."  Specifically, M.A.C.
testified that Petitioner touched her private part, with her
clothes on, as she walked past his chair in the living room.  (Id.
at 41-42).  She further stated that Petitioner had carried her to
his bedroom, laid on top of her with her clothes on, moved up and
down so that his private part was touching hers, and moaned.  (Id.
at 42-44).  M.A.C. further testified that she saw a calendar on the
wall by Petitioner's bed that had naked women on it, and that there
were two similar calendars under his pillow.  (Id. at 44-45).

M.A.C. further stated that, a couple of times, Petitioner
asked her to take off her shirt, but she refused.  She stated that
he also asked her to look at the calendar, and that she recognized
Jenny McCarthy on the calendar.  (Id. at 45-46).  M.A.C. was asked
to identify the calendar, which was marked as State's Exhibit
Number 2.  That calendar was then admitted into evidence and
published to the jury.  (Id. at 46).

On cross-examination, Petitioner's counsel questioned M.A.C.
about her reporting of the incidents to Trooper Dean, the

investigating officer.   Although M.A.C. had testified on direct that it did not hurt when Petitioner squeezed her private part, she allegedly told Trooper Dean that it did hurt.  (Id. at 49-50).  He then read from the transcript of M.A.C.'s interview with Trooper Dean in which she stated, "[a]nd grab it really hard 'til it hurts."  (Id. at 50).

M.A.C. also denied that anyone else had ever touched her in an inappropriate manner.   (Id. at 50-51).   M.A.C. denied telling Petitioner's wife that her mother's boyfriend had touched her. (Id. at 51).

The girls' mother, Cynthia C. (hereinafter "Cindy"), also testified for the State.   Cindy testified that she has five children, including the two girls.  At the time of the trial, and of the alleged incidents, Cindy and the children lived in Ohio, but would return to the Parkersburg area to visit family.  During those visits, J.E.C. and M.A.C. would often stay at Petitioner's house. Petitioner's wife, Barbara, is Cindy's aunt.  (Id. at 53-55).

Cindy confirmed that J.E.C. and M.A.C. had stayed at Petitioner's house on occasion during the summers of 1995 and 1996. Cindy stated that she first became aware of the allegations of sexual abuse when J.E.C. began crying about going to stay with Petitioner.   Cindy testified that J.E.C. told her that "Uncle Martin touches her and [M.A.C.] and bothers her and [M.A.C.]" (Id. at 57).  At that time, M.A.C. was already at Petitioner's house, so Cindy went out there to pick her up.  (Id.)  Cindy then asked

8

M.A.C. if anyone had been bothering her.  M.A.C. showed her what Petitioner had allegedly done to her.  (<u>Id.</u> at 57-58).  She then squeezed Cindy's arm hard enough to hurt her.  (<u>Id.</u> at 58).

On cross-examination, Cindy confirmed that neither girl had previously complained about anything Petitioner had done, and that neither girl had exhibited any bruises or complained of soreness or pain.  (<u>Id.</u> at 59).  She did not notice the girls acting strange around Petitioner either.  (<u>Id.</u> at 60).  She stated that they would normally hug him when they left.  (<u>Id.</u>)

During a recess, the parties argued over the admissibility of photographs of the calendars found in Petitioner's bedroom. Petitioner had objected to their admission on the basis of undue prejudice because the pictures contained a depiction of the calendars on the wall, flanking a picture of Jesus Christ. Petitioner's counsel specifically argued:

> MR. SANTER:  First off, I still feel that they are not relevant.  The only testimony we have heard so far concerning any pictures, was through [M.A.C.] And she only testified as to one calendar that has already been admitted, and that was the calendar pin-up picture of Jenny McCarthy.
>
> This other photograph was not offered to any other witness.  It is taken at a time some weeks after the last of the supposed incidents occur.  We don't know that that is the condition the wall was in at the time of the incidence because, again, the only testimony that we have had is from [M.A.C.] and she only described a calendar. And again, that is a calendar that was admitted so I feel that it is not relevant.
>
> Again, if the court feels that it is relevant, then I believe, under the balancing test, clearly it is unfairly prejudicial to my client in that it is likely to

9

inflame a member or members of this jury. The obvious
close proximity to the religious picture, to these
pictures, which could be characterized as pornographic,
I think it would be offensive to many Christians or, for
that matter, people of other religious denominations
realizing the significance of that picture.

So I feel that in a balancing test, the probative
value, which is minimal, one there has been testimony
about the calendar. The calendar has already been
admitted. Versus the inflammatory or prejudicial effect,
there is no balance; that the inflammatory nature and
probability of the prejudicial effect against Mr. Bailey
far outweighs any supposed probative value.

And we would again ask the Court to exclude those
photographs.

(Id. at 63-64).   In response, the State argued that the pictures

bolstered M.A.C.'s testimony that she had been in the bedroom and

that Petitioner told her to look at the calendar on the wall, so

the location of the calendar in the picture was important. (Id. at

65-67).   The trial court ruled that the photographs were

admissible. (Id. at 68).

The last witness to testify in the State's case-in-chief was

West Virginia State Trooper Jeffrey Dean.   Trooper Dean

investigated the allegations made by J.E.C. and M.A.C.  He stated

that he first met with the girls and Cindy on July 16, 1996. (Id.

at 70).  He stated that his investigation included interviews of

the girls, several other witnesses, and Petitioner.  A search of

Petitioner's house, pursuant to a search warrant, was also

conducted. (Id. at 70-71).  The search was conducted in order to

look for the calendars that M.A.C. had described. (Id. at 71).

Trooper Dean located the "Jenny McCarthy" calendar in what he was

told was Petitioner's bedroom.  The calendar was located where M.A.C. had stated.  (Id. at 71-72).  Trooper Dean then identified the calendar, as well as the pictures that has been ruled admissible by the trial court.  (Id. at 72-73).

Trooper Dean testified that Petitioner voluntarily agreed to speak with him.  A statement was taken from Petitioner in the presence of his wife, which was recorded on a cassette tape.  At trial, the tape was played for the jury and copies of a transcript of the tape were provided to the jurors.  (Id. at 73-75).  Neither the tape, nor the transcript, are a part of the record before this court.  Trooper Dean confirmed that he had advised Petitioner of J.E.C.'s allegation that he had forced her to perform oral sex on him.  At no time did Petitioner advise Trooper Dean that he allegedly was impotent.  (Id. at 76).

On cross-examination, Petitioner's counsel questioned Trooper Dean about his interviews of the girls.  Trooper Dean confirmed that neither of the girls had complained of any pain or discomfort. Trooper Dean stated that, at the time of the interview, it had been about 10 days since the last alleged incident.  (Id. at 77-78).

At the close of the State's case, Petitioner's counsel moved to dismiss the charges as vague.  The trial court denied the motion.  (Id. at 80-83).

Petitioner took the stand in his own defense, and also called his wife and her sister to testify on his behalf.  Petitioner's wife, Barbara Bailey, testified that the girls came to stay with

them, mostly on the weekends, but in the summer of 1995, they came and stayed for a week.  They also came and stayed for a week in the summer of 1996.  Barbara testified that, during the course of those weeks, she had to work from 4:30 a.m. until 1:30 p.m., and that Petitioner stayed with the girls during that time.  (Id. at 93-95, 98, 103).

Barbara stated that she believed that the girls got along fine with Petitioner and that she never observed the girls acting unusual around him.  (Id. at 97-98).  However, Barbara testified that there was a time, when she was present, when the girls went outside the house and took their clothes off and ran around naked. Barbara stated that she "told them it wasn't a nudist colony" and made them put their clothes back on.  (Id. at 100).

Barbara further testified that Petitioner had suffered a stroke in 1990, and that he is now impotent.  (Id. at 99).  Barbara further stated that Petitioner cannot do much without tiring easily.  (Id. at 102).  Barbara also confirmed that the calendars on the wall in their bedroom "had been on [her] wall for years." (Id. at 101).

Barbara's sister, Winnie Lula Bradley, testified that she had known Petitioner since he was about ten years old, that she had observed Petitioner with the two girls, and that she neither witnessed any inappropriate behavior, nor heard the girls complain about how Petitioner behaved towards them.  She stated that they never acted afraid around him, and usually gave him a hug and a

12

kiss on the cheek.  The last time she saw either of the girls at Petitioner's house was on the 4th of July, 1996.  M.A.C. was there that day; J.E.C. was not.  (Id. at 104-108).

At the conclusion of Ms. Bradley's testimony, and outside the presence of the jury, Petitioner's counsel addressed additional evidence that had been excluded by the trial court.  Petitioner's counsel proffered that both Ms. Bradley and Barbara, if permitted, would have testified that Cindy had commented to them that her boyfriend, Kenny, told her she needed to make a choice between him and the girls.  (Id. at 109).  Petitioner's counsel further stated:

> And again, that was done in the presence of the girls.  And I believe it goes towards a reason that these girls would manufacture these things.  One, again, as we argued earlier to the Court, their mom dumped these girls off with some frequency, and I think that was evident through the one girl, and that was [J.E.C.], that their mother had left them with this woman in Vienna for four months, together with their little brother.  And it is obvious that they had been left at the Baileys with some frequency, that these girls would have the reason to make this up in the hopes of keeping their mother from leaving them anywhere and to make it more difficult for their mother to pick or choose Kenny over themselves.  So I want the record to show that is what that evidence would have been.

(Id.)

Then Petitioner took the stand.  Petitioner testified that the girls generally came to stay with them on the weekends, when Barbara had to work, so they would stay there with him.  He testified that he would take Barbara to work at 4:30 a.m., and that the girls went along with them, so they would not be left alone at the house.  (Id. at 111-112).  Petitioner stated that, on a typical

13

day, they would come back to the house and he would fix the girls breakfast, and they would color or watch t.v., while he did some chores. (Id. at 112).

Petitioner repeatedly denied that he ever touched the girls sexually or in any inappropriate way. (Id. at 112, 116, 121). He stated that he has been impotent since his stroke in 1990, but he admitted that he has never told a doctor about his problem, so it has never been diagnosed. (Id. at 113-114, 117-119). Petitioner further admitted that he did not tell Trooper Dean about his alleged impotency when accused of these crimes. (Id. at 122-123). Petitioner further admitted to having the calendar on his bedroom wall when the girls were staying there. (Id. at 121-122).

In his statement to Trooper Dean, Petitioner apparently described some unusual behaviors exhibited by the girls. The statement is not a part of the record before this court, so the alleged behavior is unknown to the undersigned. (Id. at 115).

In rebuttal, the State called Kara Kent, the clinical director of the Child and Adolescent Program at the Worthington Center in Parkersburg, who testified about the interaction between victims of child sexual abuse and their abusers. Although not qualified as an expert by the court, Ms. Kent gave opinion testimony as follows:

> There are two perspectives of any part of a sexually
> abusive relationship. There is the child, the victim,
> and the adult or the perpetrator. There are two
> different roles involved. There are two different
> thoughts about what the relationship is. From the
> child's perspective, the relationship is one of love and
> attention; maybe they get extras, maybe they don't, but

14

there is something there, and they come into the
relationship as the young child learning from the adult
what all children expect from adults.

When it is a sexual relationship, however, the
perpetrator has a different thought in his mind and will
take advantage of the child's natural curiosity.  They
will take advantage of the child's willingness to believe
adults and to follow adults' directions.  As the
relationship builds, at some point the victim becomes
aware of a different relationship than what they have or
have had with any other adult, but they don't know what
to do with that.  It is just different.  They feel
different.

(# 13, Ex. 10 at 5).  Ms. Kent further testified that it would be

normal for a child to continue that relationship as it had been

previously established, and will be hesitant to report the behavior

because of shame, etc.  (Id. at 7).

On December 12, 2003, after Petitioner, by counsel, filed an

amended habeas corpus petition in the Circuit Court of Wood County,

an evidentiary hearing was conducted on the petition.  Petitioner

testified at the evidentiary hearing.  First, his counsel confirmed

with him that they had gone over all of the possible grounds for

habeas corpus relief, and that he understood the grounds they had

raised in the petition.  His counsel, Daniel Radcliff, proffered

that Petitioner would waive any other grounds for relief.  (# 13,

Ex. 11 at 5-9).

Petitioner then testified about two of the grounds contained

in his petition.  First, he asserted that his appointed trial

counsel provided ineffective assistance of counsel because he

failed to call Petitioner's sons as witnesses, and failed to even

15

interview them.   However, Petitioner had no idea how their testimony could have benefitted his defense.  He could only state, "I told him that my two boys would be witnesses of something." (Id. at 11).

Petitioner also asserted that his trial counsel provided ineffective assistance because he did nothing to aid Petitioner after Petitioner told him he suffered from a hearing impairment.[2] At the time of his trial, Petitioner did not wear a hearing aid. (Id. at 15).  Subsequently, in 2000, Petitioner had his hearing tested and he was fitted for a hearing aid at that time.  (Id. at 17).  Petitioner asserts that he could not hear the testimony of the witnesses who testified at his trial.   As a result, he contended that he was denied his right to confront witnesses under the Sixth Amendment.  He further asserted that he told his attorney about his hearing problem, but his attorney did not bring it to the attention of the court or do anything to assist Petitioner.

At the evidentiary hearing on December 12, 2003, Petitioner's trial counsel, Joseph T. Santer, also testified.  Mr. Santer stated that he did not recall Petitioner telling him that he could not hear, and he has no notes in his file to that effect.  (Id. at 24). Mr. Santer also testified that he does not recall Petitioner stating that his step-sons would be potential witnesses.  (Id. at 25).  Specifically, Mr. Santer stated, "I do recall them being

---

[2]   It would appear to the undersigned that Petitioner has abandoned this claim in his federal petition.

16

here.  Don't know whether it was Martin that told me that or it was his wife, Barbara, but I know they both were here.  But I don't recall any indication that they would possibly be witnesses."
(<u>Id.</u>)

<div align="center"><b><u>ANALYSIS</u></b></div>

**A.    Grounds Two and Six - denial of fair trial based upon admission of unduly prejudicial evidence and ineffective assistance of counsel for failure to move for exclusion of same.**

In Ground Two of his section 2254 petition, Petitioner has raised three claims of ineffective assistance of counsel.  The first claim concerns Petitioner's counsel's alleged failure to move to exclude evidence that Petitioner asserts was unduly prejudicial.  In Ground Six of his federal petition, Petitioner further asserts that the admission of such unduly prejudicial evidence denied him the right to a fair trial.  Petitioner claims that his counsel "did not make the proper filing of Motions to prevent irrelevant exhibits which had nothing to do with the trial before the jury."  (# 1 at 6(f)).  Petitioner does not elaborate on this claim in his petition.

Respondent's Motion contends:

Petitioner fails to specify what motions should have been made, what exhibits are irrelevant, and just how this affected the outcome of his trial.  It should be noted that the Petitioner's counsel did, in fact, move that certain items[,] namely photographs [of] two "girlie" calendars and a representation of Jesus Christ which were arrayed on the wall of the Petitioner's bedroom, be "suppressed."  (Resp't Ex. 9 at 4.)  Assuming, <u>arguendo</u>, that these are the "exhibits" to which the Petitioner refers, the factual predicate for this claim is

<div align="center">17</div>

> inaccurate.   His counsel did, in fact, make a motion
> regarding these exhibits, and the trial court denied the
> motion . . . . A motion which is denied is not evidence
> of ineffective assistance - it is just an adverse ruling.
> As the trial court observed about the photographs, "just
> because something is prejudicial does not mean that it is
> not admissible in a criminal case against the accused.
> (Resp't Ex. 9 at 6.)

(# 12 at 9).  Petitioner's Reply (# 18) adds nothing on this issue.

Based upon an exhaustive review of the record, the undersigned assumes that the exhibits to which Petitioner is referring are the pictures of the wall in Petitioner's bedroom, which depict a picture of Jesus Christ flanked by several "girlie" calendars.[3] The trial transcript indicates that, prior to the start of Petitioner's trial, his counsel did move to exclude those photographs as unduly prejudicial and unnecessary. (# 13, Ex. 9 at 4).

Petitioner's counsel argued that the photographs were cumulative in light of the fact that the State planned to introduce the calendars themselves, and that the witnesses could testify to their location. (Id. at 5). Petitioner's counsel further asserted that the combination of a depiction of Jesus Christ with "pornographic" pictures would be unduly prejudicial and might offend members of the jury panel. (Id. at 4).

The State argued that, because the case was largely circumstantial, the photographs were relevant to and would

---

[3]  The undersigned notes that the photographs are not a part of the record before this court.

18

corroborate M.A.C.'s testimony that she saw the calendar(s) on the wall in Petitioner's bedroom.  (<u>Id.</u> at 4-5).  The trial court then found that, "It is highly probative.  It is necessary.  And if this is necessary to corroborate the testimony, the otherwise uncorroborated testimony of a child witness, it is necessary so I am inclined to say it is probably going to be admissible.  And we will rule on that when it comes to that."  (<u>Id.</u> at 7).

Subsequently, when the State moved to admit the photographs, Petitioner's counsel again argued that the photographs were not admissible because they were "unfairly prejudicial to my client in that it is likely to inflame a member or members of this jury." (<u>Id.</u> at 64).  The trial court found as follows:

> In this particular case, the Court finds that the argument by the Prosecutor, concerning the reason for the admission of this is credible and that there is some probative evidence in these photographs.  After all, this is a sex crime, an unnatural sex crime.  These photographs, not just the one that has been admitted, but all of them, on that wall, certainly lend credence to that, to the effect that the Defendant has unnatural sex urges and inclinations.  I say he is not going to admit that they were there, that he looked at them during the commission of any acts against this child.
>
> * * *
>
> But this tends to show that the child was there, saw them, and saw the photographs, and also saw him looking at them like she said.
>
> * * *
>
> So I think, on balance, that it should be admitted under the statement of the law in Cleckley's book on evidence and the cases cited thereunder because its probative value does outweigh its inflammatory nature.  I might say, in that regard, the pictures weren't put there by

the victim.

* * *

And if they are inflammatory, just because the Defendant put them there; he considers them inflammatory. And if he knew he was going to be tried, he wouldn't have put them there. That is all. In other words, it is his own actions which have created this apparently inflammatory picture. Nobody else's. The police didn't create it. The victim didn't create it.

(Id. at 67-68).

The undersigned will first address the ineffective assistance of counsel claim. In Strickland v. Washington, 466 U.S. 688 (1984), the United States Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687-91. Moreover, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).

The state habeas court did not make a specific finding concerning this claim of ineffective assistance of counsel. However, because Petitioner's counsel did move, albeit unsuccessfully, to exclude the photographs as evidence at Petitioner's trial, Petitioner cannot demonstrate that his

counsel's representation fell below an objective standard of reasonableness on this basis.

Turning to the issue of prejudice and whether Petitioner was denied a fair trial by the admission of this evidence, the state habeas court found as follows:

> The admission into evidence of the photographs of the calendars in the Petitioner's bedroom were offered to corroborate the testimony of one of the victims by showing that they were where she said they were. Furthermore, the introduction of the photographs cannot be said to be considered prejudicial since the calendars themselves were admitted, and that fact is not complained of here.  The photographs were relevant and properly admitted as evidence.

(# 7, Ex. 7 at 2).

The inquiry of this federal habeas court is not whether the photographs were properly admitted under state evidentiary law, but rather whether Petitioner was denied a fair trial, based upon their admission.  In order to show that he was denied a fair trial based upon the admission of this evidence, Petitioner must demonstrate that the admission of the evidence was fundamentally unfair and that, without the admission of such evidence, the outcome of the trial would have been different.  Petitioner has not made such a showing.

As will be addressed herein, there was sufficient evidence upon which to convict Petitioner of the crimes with which he was charged, and he has not demonstrated any evidence to support his assertion that the presentation of photographs containing a depiction of Jesus Christ between two "girlie" or "pornographic"

21

calendars caused the jury to convict him where they otherwise would not have.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated either that the evidence admitted at his trial was unduly prejudicial, or that his counsel provided ineffective assistance by failing to move to exclude unduly prejudicial evidence.  The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these grounds were neither contrary to, nor an unreasonable application of, clearly-established federal law.

> **B.    Grounds Two and Seven - denial of fair trial based on exclusion of impeachment evidence under rape shield law and ineffective assistance of counsel based on failure to object to the denial of such impeachment evidence.**

In Ground Two of his federal petition, Petitioner further asserts that his counsel "failed to file proper motions when he was denied to impeach a witness testimony when such testimony was false brought out in case in chief by the State[']s Attorney." (# 1 at 6(f)).  The undersigned believes that, through this claim, Petitioner is attempting to assert that his counsel failed to object or file a post-trial motion concerning the trial court's refusal to allow him to bring in testimony which the trial court found to be prohibited by the rape shield law in West Virginia.[4]

---

[4]    At trial, outside the presence of the jury, Petitioner's counsel sought the right to introduce evidence concerning the victims' prior sexual knowledge.

In Ground Seven of his federal petition, Petitioner further asserts that the exclusion of this "impeachment" evidence denied him a fair trial.  (Id. at 6(p)).  Petitioner asserts:

> The State's evidence consisted chiefly of the uncorroborated testimony of the two young girls.  There were no eyewitnesses to these events nor any visible or physical indications that any sexual assault or abuse had taken place.

(Id.)  In Ground Five of his amended petition filed in Wood County Circuit Court, Petitioner added:

> In its opening statement and in an apparent effort to lend credibility to the girl[s'] testimony, the State alluded to the fact that the only way these youngsters could know about such sexual activity is if their claims were true.  (T.T. p. 19).  When, in refutation of this assertion, Petitioner attempted to introduce evidence that the girls had prior sexual knowledge, the Court, relying on the rape shield law, prohibited it.  (T.T, p. 83-91).

(# 7, Ex. 6 at 6).

Respondent's Motion contends:

> The Petitioner claims that one of his witnesses would have testified that the victims had previously accused another person of sexually inappropriate conduct.  As stated above, the Petitioner has failed to identify this witness, to summarize the witness's testimony, to specify the prior sexual experiences of these 9- and 11-year-old victims, or to explain why the evidence trumps the State's rape shield law.  See W. Va. Code § 61-8B-11(b).

> In the abstract, any evidence of this nature would have been minimally probative.  The State did not introduce medical evidence of penetration nor did it argue that the victims['] only source of sexual knowledge was the Petitioner.  The victims' testimony was not sexually explicit; both referred to the Petitioner's genitalia as his "private parts."

> Petitioner claims that counsel for the State "opened the door" to this evidence during her opening argument by

> stating: "Remember, [the victims] are still young girls
> who will tell you about sexual acts that no child should
> know of at this age, nor should they have been subject
> to." (Resp't Ex. 9 at 19.) Opening statements are not
> evidence. The State's comment was not focused on the
> victims' sexual sophistication: It addressed the
> abhorrent nature of the Petitioner's conduct.

(# 12 at 20-21).

On cross-examination, both victims stated that noone else had ever touched them in an inappropriate way. Petitioner's counsel sought to develop evidence that the victims had told their great aunt Barbara (Petitioner's wife) that their mother's boyfriend had touched them before. Both girls said they did not recall saying that. (# 13, Ex. 9 at 34, 51). Before the defense presented its case, however, the prosecutor objected to the defense's desire to present additional evidence concerning the victims' prior sexual knowledge, in an attempt to impeach the victims. (# 13, Ex. 9 at 88).

Petitioner's counsel claimed that the State had opened the door to such evidence based upon the prosecutor's opening statement, in which she stated "Remember they are still young girls who will tell you about sexual acts that no child should know of at this age, nor should they have been subject to." (# 13, Ex. 9 at 19, 88). The trial court ruled as follows:

> I rule that it will be inadmissible in this case under
> any circumstances, except on the outside chance that the
> Defendant is prepared to prove that the statements were
> made and that they were false, in which case I don't even
> think that is admissible because these children said they
> didn't remember ever making such a statement. And the
> rape shield law is so strong that I don't think that it

24

> can be used to impeach, which is just about what they
> were trying to do with this case with Judge Madden in
> Marshall County.  The Supreme Court overruled them in not
> allowing that.  I think, on balance, it should not be
> admissible.

(Id. at 91).  Petitioner's counsel then stated that he did not
intend to pursue that line of questioning.  (Id.)

 The state habeas court's ruling on this claim states, "There
was not, at the time of trial, nor is there now, any reason given
for why the evidence hereby propounded by the Petitioner would have
been relevant."  (# 7, Ex. 7 at 4).

As noted by Respondent, "state court evidentiary rulings
respecting the admission of evidence are cognizable in federal
habeas corpus only to the extent that they violate specific
constitutional provisions or are so egregious as to render the
entire trial fundamentally unfair and thereby violate due process
under the Fourteenth Amendment." Estelle v. McGuire, 502 U.S. 62,
67-68 (1991).

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has not demonstrated that the exclusion of
evidence concerning any prior sexual abuse of the victims in this
case was not so egregious as to render the trial fundamentally
unfair and, thus Petitioner has not demonstrated a violation of his
due process rights.

Furthermore, because Petitioner cannot demonstrate that his
defense was prejudiced by the exclusion of this so-called
"impeachment" evidence, he also cannot demonstrate that his counsel

25

provided ineffective assistance by failing to challenge that denial.  On this issue, the state habeas court found that "[n]o evidence was presented to indicate that trial counsel's failure to object to claimed testimony concerning the credibility of the victim was ineffective or would have had any bearing on the verdicts returned by the jury." (# 7, Ex. 7 at 4, ¶ 8). Petitioner has not disputed this finding with clear and convincing evidence.

The undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these grounds were neither contrary to, nor an unreasonable application of, clearly-established federal law.

**C.   Ground Two - other claims of ineffective assistance of counsel.**

1.   Failure to call witnesses

In Ground Two of his federal petition, Petitioner also asserts that his trial counsel provided ineffective assistance of counsel because he failed to call certain witnesses in Petitioner's defense. (# 1 at 6(f)).  As noted previously herein, at the state court evidentiary hearing, Petitioner identified his two step-sons as the witnesses who should have been called, but he was unable to demonstrate what their testimony would have been.

Respondent's motion contends that Petitioner fails to provide any factual basis for this claim. (# 12 at 10).  The only significant statement concerning this claim in Petitioner's Reply

is Petitioner's assertion that his counsel "failed to investigate witnesses, who if they had called or done any meaningful investigation, the jury's verdict would have been different." (# 18 at 24).

The state habeas court found that "[t]he evidence presented at the evidentiary hearing in this matter shows that the so called witnesses which were not called by trial counsel at trial had no relevant testimony to give concerning the facts of this case." (# 7, Ex. 7 at 4, ¶ 10). Petitioner has offered no evidence to contradict this finding.

A petitioner cannot demonstrate ineffective assistance of counsel where a witness who is not called to testify would not have helped the defense. See Jones v. Taylor, 547 F.2d 808, 810 (4th Cir. 1977). Furthermore, the decision of whether to call a witness is a matter of trial strategy. The United States Court of Appeals for the Fourth Circuit has held that ineffective assistance of counsel may not be established by questioning counsel's choice of strategy. See Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his trial counsel was ineffective by failing to call Petitioner's step-sons as witnesses at his trial, and that the state courts' decisions denying Petitioner habeas corpus relief on this ground were neither contrary to, nor an unreasonable application of,

27

clearly-established federal law.

> 2.  Failure to investigate and present defense concerning impotence

At trial, Petitioner and his wife testified that Petitioner had been impotent since he suffered a stroke in 1990. (# 13, Ex. 9 at 99, 113). However, Petitioner has never told a doctor about his problem, and he did not offer that information to Trooper Dean when he was first accused of committing the crimes of which he was convicted. Petitioner now asserts that his trial counsel provided ineffective assistance because he did not develop this evidence at trial. Petitioner did not raise this claim in his state habeas proceedings, nor was it stated in his federal habeas petition. Rather, Petitioner addresses it for the first time in his Reply brief (# 18).

In a nutshell, Petitioner's Reply contends that his trial counsel should have introduced medical testimony proving that Petitioner was unable to commit the acts in question, due to his medical condition and his advancing age. Petitioner's Reply states:

> Before the Petitioner is able to [] perform such acts as he was accused, he would have to be medically able.
>
> Petitioner is 72 years old male who has a (8th) grade education. He relied upon the professional support of an attorney. Trial Counsel should have known from the common observation that the Petitioner's age was a major factor, and his sexual performance. The Petitioner's sexual performance one could say, his get up and go has got up and went, and the evidence show his youth has been spent. Trial Counsel[,] Joseph T. Santer, did not "consult a medical expert."

28

(# 18 at 6).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner did not raise this claim in his state court habeas corpus proceedings and, therefore, this claim is unexhausted, and must be dismissed.

> 3.  Failure to conduct adequate investigation of victims' background and psychological history

In his Reply (# 18), Petitioner also addresses claims of ineffective assistance of counsel concerning his counsel's alleged failure to investigate the victims' family background and psychological history.   Petitioner appears to assert that Petitioner should have consulted a psychological expert to impeach the victims' credibility.

These claims were not specifically addressed in either Petitioner's state habeas corpus proceedings or his section 2254 petition, and Respondent asserts that they are unexhausted.   Based upon a review of the entire record, the undersigned proposes that the presiding District Judge **FIND** that these claims have not been exhausted and must also be dismissed.

**D.   Ground Three - sufficiency of evidence.**

In Ground Three of his federal petition, Petitioner asserts that "the testimony presented in the State's evidence was insufficient, as presented in trial, even consideration in the light most favorable to prosecution.   It is submitted that the evidence was manifestly inadequate and injustice would occur if the

verdict was allowed to stand." (# 1 at 6(j)).

In reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979). As noted by Respondent, the reviewing court does not retry the evidence or redetermine the credibility of the witnesses, whose demeanor was observed by the original trier of fact. Wright v. West, 505 U.S. 277, 296 (1992); Marshall v. Lonberger, 459 U.S. 422, 434 (1983). Relief is appropriate only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson 442 U.S. at 324. (# 12 at 11).

Petitioner was convicted of one count of first degree sexual assault, five counts of sexual abuse by a parent, guardian, custodian or person in a position of trust to a child, and four counts of first degree sexual abuse. The undersigned will address the essential elements of each of these crimes and the evidence presented at Petitioner's trial in support thereof.

Under West Virginia Code § 61-8B-3(a)(2), a person is guilty of first degree sexual assault when, among other things, a person greater than fourteen years of age engages in "sexual intercourse" with someone who is eleven years old or younger and is not married to that person. W. Va. Code § 61-8B-3(a)(2). The definition of

30

"sexual intercourse" under West Virginia Code § 61-8B-1(7) includes "contact between the sex organs of one person and the mouth or anus of another person."  W. Va. Code § 61-8B-1(7).

In support of the charge of first degree sexual assault, the State presented the following testimony from the victim, J.E.C., who was ten years old at the time of the crime:

Q.   Could you tell us what you were doing that morning?

A.   He fixed me eggs for breakfast, and then he told me to come here.  And then I sat down on the floor, and then he took his penis out and started pushing my head down, and made me start sucking.

Q.   So where did he place his penis?

A.   In my mouth.

Q.   And he told you to do what?

A.   Start sucking.

Q.   Okay.  Did you do that?

A.   (Nodding.)

Q.   What happened?

A.   He was pushing my head down, and I couldn't move away, and then I puked.

(# 13, Ex. 9 at 29-30).  Petitioner attempted to dispute this evidence with the self-serving testimony of himself and his wife to the effect that he is impotent and could not have performed this act.  Petitioner did not present any other evidence to support his contention.

Taking this evidence in the light most favorable to the State, the undersigned proposes that the presiding District Judge **FIND**

that a reasonable trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of first degree sexual assault.

Turning to the other charges, under West Virginia Code § 61-8B-5(a), a person is guilty of sexual abuse by a parent, guardian, custodian, or person in a position of trust to a child where a parent, guardian, custodian, or person in a position of trust in relation to a child under his or her care, custody or control engages in or attempts to engage in "sexual exploitation of, or in sexual intercourse, sexual intrusion, or sexual contact with a child under his or her care, custody or control . . . ."  W. Va. Code § 61-8B-5(a).  Similarly, under West Virginia Code § 61-8B-7(a)(3), a person is guilty of sexual abuse in the first degree where a person, who is over fourteen years of age, subjects someone who is eleven years old or younger to "sexual contact."  W. Va. Code § 61-8B-7(a)(3).  West Virginia Code § 61-8B-1(6) defines "sexual contact" as follows:

> (6) "Sexual contact" means any intentional touching, either directly or through clothing, of the anus or any part of the sex organs of another person, or the breasts of a female or intentional touching of any part of another person's body by the actor's sex organs, where the victim is not married to the actor and the touching is done for the purpose of gratifying the sexual desire of either party.

W. Va. Code § 61-8B-1(6).

In the instant case, both alleged victims testified that, on at least two different occasions, Petitioner laid on top of them

with their clothes on and rubbed up and down on them so that his "private part" touched their "private parts." (# 13, Ex. 9 at 28-29, 42-44). At the time of these alleged incidents, the girls were less than eleven years old.

Based upon this testimony, as well as J.E.C.'s testimony discussed above, taken in the light most favorable to the State, the undersigned proposes that the presiding District Judge **FIND** that a reasonable trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of five counts of sexual abuse by a custodian or person in a position of trust to a child, and four counts of sexual abuse in the first degree.

The state habeas court found as follows on this claim:

> There was sufficient evidence presented at the trial of this matter to support the verdicts of conviction against the Petitioner. Although the primary evidence presented by the State was the testimony of the victims, that testimony was corroborated by circumstantial evidence. Even without such corroboration, the victims' testimony would have been sufficient to support the convictions, as it was not inherently incredible . . . . On the contrary, their testimony was not only credible, but compelling.

(# 7, Ex. 7 at 1).

The undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this ground were neither contrary to, nor an unreasonable application of, clearly-established federal law.

**E.    Grounds Four and Five - disproportionate sentence.**

In Ground Four of his federal petition, Petitioner alleges that the consecutive nature of his ten indeterminate sentences, violates the principal of proportionality in sentencing and amounts to cruel and unusual punishment.  Specifically, Petitioner states:

> Petitioner maintains the reading of the West Virginia Code would mandate that the Petitioner would serve a term of (44) to (130) years, not (80) to (125) years, which still amounts to abuse of sentencing which amounts to cruel and unusual punishment.
>
> * * *
>
> In the present case, the Petitioner would not be eligible for parole until after 80, or by statute 44 years in prison.  The facts surrounding the case show that the Petitioner was 64 years old at the date of the sentencing and obviously the Petitioner will be 108 years old before being eligible for Parole.  The Petitioner contends that the Court did not give ample weight to the mitigating factors in this case.
>
> Additionally, the fact that the Petitioner would not be eligible for parole before life expectancy[] suggest[s] that Petitioner's sentence is disproportionate. The Petitioner respectfully moves this Court to Correct his sentence, and run his sentence[s] together.

(# 1 at 6(l), 6(h)).  Without any additional support, in Ground Five of his federal petition, Petitioner also asserts that the trial court abused its discretion in running all of the sentences consecutively, which he claims denied him a fair trial.  (# 1 at 6(o)).

Respondent first contends that these grounds for relief are not cognizable in federal habeas corpus because they are based on issues of state law.  (# 12 at 15).  Respondent's motion contends

34

that "Petitioner relies solely on the proportionality provision of the West Virginia Constitution and makes only a passing reference to Article VIII of the United States Constitution." (Id. at 16).

However, Respondent then states:

> Even if this Court were to find Petitioner's claim cognizable, the result would be the same. A sentence imposed within statutory limits is generally not subject to federal habeas review. Townsend v. Burke, 334 U.S. 736, 741 (1948). The Eighth Amendment to the United States Constitution does not require that sentences be proportionate; it only forbids sentences which are "grossly disproportionate" to the crime. Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)(Kennedy, J., concurring in part and concurring in the judgment); United States v. Rhodes, 779 F.2d 1019, 1027 (4th Cir. 1985), cert. denied, 476 U.S. 1182 (1986)(Extensive proportionality review of a sentence less than life imprisonment without the possibility of parole not constitutionally required.) Successful challenges to the proportionality of non-capital cases are "exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980).

(Id.) In a footnote, Respondent adds:

> There is no "advanced age exception" to proportionality review. See Lockyer v. Andrade, 538 U.S. 63, 74 n.1 (Argument that effect of sentence is equivalent to life without parole "misses the point." The sole issue is whether the sentence is contrary to or an unreasonable application of federal law. Additionally, a sentence of life, and a sentence of a specific term of years are not materially indistinguishable based solely upon the age of the person sentenced.); Hawkins v. Hargett, 200 F.3d 1279, 1283 (10th Cir. 1999)("The chronological age of a defendant is a factor that can be considered in determining if a punishment is grossly disproportionate to the crime inasmuch as it relates to [the defendant's] culpability.)(Emphasis added).

(Id. at 17 n.6).

Petitioner's judgment order does not specify whether his sentences were to run concurrently or consecutively. However, West

Virginia Code § 61-11-21 provides that, unless specified to run concurrently under the court's discretion, each sentence shall run consecutively.  W. Va. Code § 61-11-21; <u>Keith v. Leverette</u>, 254 S.E.2d 700, 702-703 (W. Va. 1979).  Thus, Petitioner's sentences must be run consecutively.

Each of Petitioner's sentences was within the statutory limits.  Thus, individually, the sentences are not subject to habeas corpus review.  <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948).  Therefore, the sole cognizable issue presented by Grounds Four and Five of Petitioner's federal petition is whether the consecutive sentences imposed on all ten counts of conviction for sexual crimes involving minors is "grossly disproportionate" in violation of the Eighth Amendment's protection against cruel and unusual punishment.

As noted by Respondent, the Eighth Amendment provides a narrow proportionality guarantee in non-capital cases, which forbids only "extreme sentences" that are "grossly disproportionate" to the crime.  <u>Harmelin v. Michigan</u>, 501 U.S. 957, 996-997, 1001 (1991).  In a badly-splintered plurality opinion, the Court restricted proportionality review to the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  <u>Id.</u> at 1005.

Justice Kennedy, concurring in the opinion, identified four "principles of proportionality review" which were common to the Court's jurisprudence: (1) the primacy of the legislature; (2) the variety of legitimate penological schemes; (3) the nature of our

36

federal system; and (4) the requirement that proportionality review be guided by objective factors.  Id. at 998-1001.

In Ewing v. California, 538 U.S. 11 (2003), the United States Supreme Court again addressed the issue of disproportionate sentences under the Eighth Amendment, applying the proportionality principles recognized in Justice Kennedy's concurrence in Harmelin to a sentence imposed under California's three strikes rule.  The Court found that Ewing's sentence of 25 years to life for felony grand theft was not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality."  Id. at 1190 (quoting Harmelin, 501 U.S. at 1005).

As the sentences for sexual offenses are set by statute in West Virginia, the only discretion the trial court had in sentencing Petitioner was whether to run the sentences concurrently.  The fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts.  Rummel v. Estelle, 445 U.S. 263, 275-276 (1980).  The West Virginia Legislature has established lengthy sentences for sex offenders, and defendants are often convicted on multiple counts for multiple incidents of sexual assault or abuse.  Therefore, lengthy consecutive sentences are not unusual, in the constitutional sense, in such cases.  See Harmelin, 501 U.S. at 994.

Turning to Petitioner's assertion that his age should have been considered as a mitigating factor, the United States Supreme Court, while recognizing age as a factor that can be considered in determining whether a sentence is grossly disproportionate,[5] has instructed courts to "compare the gravity of the offense with the severity of the sentence by looking at 'the harm caused or threatened to the victim or society, and the culpability of the offender.'"  Hawkins v. Hargett, 200 F.3d at 1283 (quoting Solem v. Helm, 463 U.S. 277, 292 (1983)).

In his amended state habeas petition, Petitioner asserted that his sentence of incarceration for 44-130 years violated both his Eighth Amendment rights and the proportionality provisions of the West Virginia Constitution.  (# 7, Ex. 6 at 5).  The state habeas court found as follows on this claim:

> Contrary to the claim of the Petitioner, acts of sexual molestation are crimes of violence even if no apparent physical or psychological harm are evident. This is particularly true when the victim is a child. The acts committed by the Petitioner were multiple and involved two child victims.  The fact that the Petitioner was sixty years of age and suffered from some medical condition does not lessen the severity of his conduct nor give any cause for mitigation of his sentences.

(# 7, Ex. 7 at 2).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his consecutive

---

    [5]  The undersigned notes that the case law on this issue has largely concerned juveniles charged with capital crimes or those subject to statutorily-mandated terms.

sentences on ten counts of conviction for sexual offenses against minors in the Circuit Court of Wood County are "grossly disproportionate" to his crimes and, therefore, he has not demonstrated a violation of his Eighth Amendment rights. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these grounds were neither contrary to, nor an unreasonable application of, clearly-established federal law.

For the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and that Respondent is entitled to summary judgment on each of Petitioner's grounds for relief contained in his section 2254 petition. Accordingly, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 12-2) as to each and every ground for relief contained in Petitioner's section 2254 petition, and **DENY AS MOOT** Respondent's Motion to Dismiss (# 12-1).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this

39

Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on the opposing party, Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

<div style="float:left">
_____<br>
July 6, 2006<br>
Date
</div>

<div style="float:right">
Mary E. Stanley<br>
United States Magistrate Judge
</div>

40